IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

RICHARD BIELENBERG,

               Plaintiff,                              CV-09-1188-ST

     v.

ODS HEALTH PLAN, INC., and METRO WEST             REDACTED
AMBULANCE SERVICES, INC.,                         OPINION AND ORDER

               Defendants.

_____

ODS HEALTH PLAN, INC., administrator of the
METRO WEST AMBULANCE SERVICES, INC.
PPO High Deductible Plan,

               Counterclaimant,

     v.

THE LAW OFFICES OF BRANDON B.
MAYFIELD, as Trustee of the Richard Bielenberg,
Beneficiary, Client Lawyer Trust Account,

               Counterclaim Defendant.

_____

1 - REDACTED OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Richard Bielenberg ("Bielenberg"), originally filed this action in Multnomah County Circuit Court on August 28, 2009. Bielenberg seeks declaratory relief against his employer, Metro West Ambulance Services, Inc. ("Metro West"), and ODS Health Plan, Inc. ("ODS") with respect to the existence of certain subrogation and reimbursement rights under the terms of a health insurance policy ("Benefit Plan") sponsored and funded by MetroWest.

ODS removed this case to this court on October 7, 2009, based on 28 USC §§ 1331, 1441(a), and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 USC §§ 1132(a)(3), (e)(1). ODS and Metro West later filed two alternative counterclaims against Bielenberg and a Counterclaim against defendant Law Offices of Brandon Mayfield ("Mayfield Law Office"), as trustee of two accounts entitled "Richard Bielenberg, beneficiary, Client Trust Account" ("Bielenberg Trust Account"). ODS's Amended Answer, Affirmative Defenses, and Counterclaims ("ODS's Amended Answer") (docket #20);[1] Metro West's Answer, Affirmative Defenses, and Counterclaims ("Metro West's Amended Answer") (docket #28). In their First Counterclaims, ODS and Metro West seek declaratory relief against Bielenberg and (Counterclaim Defendant) Bielenberg Trust Account, and a constructive trust against the

---

[1] Certain other pleadings were filed between the filing of the Notice of Removal October 7, 2009, and the filing of ODS's Amended Answer on December 24, 2009. Those pleadings unnecessarily named other parties who have now been dismissed and created docketing confusion, which has since been clarified. *See* Minute Order (docket #38) (dismissing Brandon M. Mayfield and Law Office of Brandon Mayfield) and Minute Order (docket #43) (administrative correction of duplicate and incorrect party types). The current pleadings are as follows: (1) the original Complaint (attached to Notice of Removal (docket #1) as Exhibit 1); (2) ODS's Amended Answer, Affirmative Defenses, and Counterclaims (docket #20); (3) Plaintiff's Amended Answer to Defendant ODS's Amended Counterclaims (docket #23); (4) Law Office of Brandon B. Mayfield's Amended Answer to Counterclaims of ODS Health Plan, Inc. (docket #24); (5) Metro West's Amended Answer, Affirmative Defenses, and Counterclaims (docket #28); (6) Plaintiff's Answer to Defendant Metro West's Amended Counterclaims (docket #30); and (7) Law Office of Brandon B. Mayfield's Answer to Amended Counterclaims of Metro West Ambulance Services, Inc. (docket #31).

Bielenberg Trust Account, in order to recover $158,434.52 in settlement funds that ODS and Metro West contend belong to the Benefit Plan. ODS's Amended Answer, ¶¶ 18-33; Metro West's Amended Answer, ¶¶ 18-33. In the alternative, ODS and Metro West allege a Second Counterclaim for breach of contract, asserting that Bielenberg breached the Benefit Plan, causing damages of the same amount ($158,434.52) to the Benefit Plan. ODS's Amended Answer, ¶¶ 34-39; Metro West's Amended Answer, ¶¶ 34-39. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Bielenberg has now filed a Motion for Leave to File an Amended Complaint (docket #80), seeking to add a claim for penalties under 29 USC § 1132(c)(1). Additionally, the parties have filed cross-motions for summary judgment, including ODS's Motion for Partial Summary Judgment (docket #44), Metro West's Motion for Partial Summary Judgment (docket #49) (joining in ODS's motion), Plaintiff's Motion for Summary Judgment (docket #61), and Counterclaim Defendant's Motion for Summary Judgment (docket #71) (joining Bielenberg's motion in part). In addition, in response to Bielenberg's motion for summary judgment, ODS seeks to strike certain portions of the declarations of Bielenberg and his attorneys, Brandon Mayfield ("Mayfield") and Gary Linkous ("Linkous"). *See* ODS's Memorandum in Opposition to Plaintiff's and Counterclaim Defendant's Motions for Summary Judgment (docket #90), p. 4 and Ex. 1.

For the reasons that follow, ODS's Motion for Partial Summary Judgment (docket #44), Metro West's Motion for Partial Summary Judgment (docket #49), Plaintiff's Motion for Summary Judgment (docket #61), and Counterclaim Defendant's Motion for Summary Judgment

(docket #71) are GRANTED IN PART AND DENIED IN PART, and Bielenberg's Motion for

Leave to File an Amended Complaint (docket #80) is DENIED.

### BACKGROUND

### I. Benefit Plan and Medical Care

Effective January 1, 2007, Bielenberg was covered under the Metro West Ambulance

Services, Inc. PPO High Deductible Plan (the Benefit Plan), which was funded by Metro West

and administered by ODS.[2]  Born in 1979, Bielenberg lost one of his kidneys as an infant, placing

him at an increased level of risk of injury or disease to the remaining kidney.  On or about

November 22, 2004, Bielenberg became a patient of Dr. Richard Larson, a family physician in

Silverton, Oregon.  At the time he began treatment with Dr. Larson, Bielenberg had already been

suffering for years from chronic kidney disease of his remaining kidney.

Dr. Larson administered a blood test in September 2005 and failed to follow up on

laboratory results which showed elevated creatinine levels (evidence that Bielenberg was already

suffering from advancing and chronic renal insufficiency).

On April 19, 2006, Bielenberg was admitted to the emergency room at the Santiam North

Lincoln Hospital in Lincoln City, Oregon.  The following day, he was transferred to Good

Samaritan Regional Medical Center, in Corvallis, Oregon, where he underwent kidney dialysis.

Bielenberg continued to undergo kidney dialysis over the course of the ensuing months into

March 2007.  Laidler Decl., Ex. 4, pp. 3, 10-11; Bielenberg Decl., ¶ 8.

-----

[2]  Bielenberg contends that he never received a full copy of the Benefit Plan until after June 2009.  Bielenberg Decl., ¶ 4.

On March 13, 2007, Bielenberg was admitted to Oregon Health Sciences University where he underwent a kidney transplant surgery and received attendant care. The Benefit Plan paid his medical bills between January 1, 2007, and December 12, 2008. Laidler Decl., pp. 3-16. ODS and Metro West contend that they paid a total of $272,123.20 relating to Bielenberg's renal failure, hypertensive kidney disease, end stage renal disease, and chronic renal failure. The bulk of payments related to Bielenberg's March 13, 2007 kidney transplant. Amounts allowed for medical charges prior to the transplant were approximately $10,500.00.[3] Pursuant to a stop loss provision in the agreement between ODS and Metro West, Metro West paid the first $150,000.00 in claims relating to Bielenberg's medical care for 2007. Mayfield Decl., Ex. 10. ODS paid the remaining claims, totaling over $100,000.00. *Id.*

## II. __Third Party Liability Provisions of the Benefit Plan__

ODS is the Benefit Plan's named Claims Administrator. Laidler Decl., Ex. 1, p. 9.[4] The Benefit Plan's Summary Plan Description lists Metro West as the plan sponsor, plan administrator, and named fiduciary. *Id*, p. 10. The Benefit Plan contains a section on "Benefits Available from Other Sources," with subsections on Coordination of Benefits and Third-Party Liability. *Id*, pp. 11-14. The Third-Party Liability subsection provides as follows:

> An individual covered by the Plan may have a legal right to recover
> benefit or healthcare costs from another person, organization or

---

[3] Although ODS admitted that the amount allowed for medical charges from January 1 to March 13, 2007 was "in the area" of $10,500.00, it is unclear how this figure is calculated. The claims ledger detailing amounts paid on behalf of Bielenberg shows over $13,575.00 in claims predating March 13, 2007. Laidler Decl., Ex. 4, pp. 3, 8, 10-12. However, because it provides scant information other than the name of the provider and the dates of service, the claims ledger permits only an educated guess concerning the nature of the services performed.

[4] The cited provisions are from the 2007 version of the Benefit Plan. As they pertain to this case, the provisions of the 2008 version of the Benefit Plan are substantively identical to the 2007 version. *See* Laidler Decl., Ex. 2. This court will cite only to the 2007 version of the Benefit Plan.

entity, or an insurer, as a result of an illness or injury of which benefits or healthcare costs were paid by the Plan. . . . Should the Plan make an advance payment of Benefits, as described below, it is entitled to be reimbursed for any benefits paid by the Plan that are associated with any illness or injury that are or may be recoverable from a Third Party or other source.

Because recovery from a Third Party may be difficult and take a long time, and payment of benefits where a Third Party may be legally liable is excluded under the terms of this Plan, as a service to you, the Plan will pay a Covered Individuals' expenses based on the understanding and agreement that the Covered Individual is required to honor the Plan's rights of subrogation as discussed below, and, if requested by us, to reimburse the Plan in full from any recovery the Covered Individual may receive, no matter how the recovery is characterized.

Upon claiming or accepting Benefits, or the provision of Benefits, under the terms of this Plan, the member agrees that the Plan shall have the remedies and rights as stated in this Section. . . . The Covered Individual agrees to do whatever is necessary to fully secure and protect, and to do nothing to prejudice, our right of reimbursement or subrogation as discussed in this Section. We have the sole discretion to interpret and construe these reimbursement and subrogation provisions.

*Id*, p. 11.

The Benefit Plan defines a "Third Party Claim" and a "Third Party" as follows:

3. "Third Party Claim" means any claim, lawsuit, or settlement, award, verdict, judgment, arbitration decision or other action against a Third Party (or any right to assert the foregoing) by or on behalf of a Covered Individual, regardless of the characterization of the claims or damages of the Covered Individual, and regardless of the characterization of the Recovery Funds. (For example, a Covered Individual who has received payment of medical expenses from the Plan, may file a Third Party claim against the party responsible for the Covered Individual's injuries, but only seek the recovery of non-economic damages. In that case, the Plan is still entitled to recover Benefits as described herein.)

6 - REDACTED OPINION AND ORDER

4.  "Third Party" means any individual or entity responsible for the injury or illness, or the aggravation of an injury or illness, of the Covered Individual.  "Third Party" includes any insurer of such individual or entity, including different forms of liability insurance, or any other form of insurance that may pay money to or on behalf of the Covered Individual including uninsured motorist coverage, under-insured motorist coverage, premises med-pay coverage, PIP, and workers' compensation insurance.

*Id*, p. 12.

Finally, under the heading "Right of Recovery," the Benefit Plan provides that:

In addition to the Plan's subrogation rights, we may, at our sole discretion and option, ask that the Covered Individual, and his or her attorney, if any, protect the Plan's reimbursement rights.  If we elect to proceed under this sub-section, the following rules apply:

1.  The Covered Individual holds any rights of recovery against the Third Party in trust for the Plan, but only for the amount of Benefits we paid for that illness or injury.

2.  The Plan is entitled to receive the amount of Benefits it has paid for that illness or injury out of any settlement or judgment which results from exercising the right of recovery against the Third Party.  This is so regardless of whether the Third Party admits liability or asserts that the Covered Individual is also at fault.  In addition, the Plan is entitled to receive the amount of Benefits it has paid whether the health care expenses are itemized or expressly excluded in the Third Party recovery.

*            *            *

5.  This right of recovery includes the full amount of the Benefits paid, or pending payment by the Plan, out of any recovery made by the Covered Individual from the Third Party, including, without limitation, any and all amounts from the first dollars paid or payable to the Covered Individual . . . regardless of the characterization of the recovery, whether or not the Covered Individual is made whole, or whether or not any amounts are paid or payable directly by the Third Party, an insurer or another source.

*Id*, pp. 12-13.

### III.  Bielenberg Medical Malpractice Lawsuit Against Dr. Larson

On April 17, 2007, Bielenberg filed a lawsuit against Dr. Larson in Multnomah County

Circuit Court, *Bielenberg v. Larson*, Multnomah County Circuit Court Case No. 0704-04295 (the

"Bielenberg Medical Malpractice Lawsuit"), seeking over $2.5 million in damages.  The

Complaint alleged that Dr. Larson was negligent:

> a.  in failing to read and correctly interpret the blood test results
> from . . . September 20, 2006;
> b.  in failing to diagnose [Bielenberg's] advancing renal disease on
> said date;
> c.  in failing to refer [Bielenberg] to a nephrologist for appropriate
> care of the renal disease;
> d.  in failing to treat said disease; [and]
> e.  in failing to care for and treat [Bielenberg] in accordance with
> the standard of care and skill required of and ordinarily exercised
> by the average qualified physician engaged in internal and family
> medical practice at a professional level, such as that in which Dr.
> Larson is engaged.

Langfitt Decl., Ex. 7, p. 4, ¶ 18.

The Complaint further alleged that, as a result of Dr. Larson's negligence:

> [Bielenberg's] renal disease continued to advance and worsen,
> untreated, until it was diagnosed at Samaritan North Lincoln
> Hospital on April 29, 2006, by which time his kidney had failed,
> thus requiring him to undergo numerous surgeries for implantation
> of fistulas and catheters, and required him to undergo a regime of
> hemodialysis, and eventually a kidney transplant surgery.  The
> effects of kidney failure, and the subsequent treatments have
> caused pain, suffering, anxiety, and mental distress, and substantial
> interference with his daily living activities, all to his non economic
> damages in the sum of $2,500,000.00.

*Id*, ¶ 19.

On or about July 23, 2007, Bielenberg filed an Amended Complaint in the Bielenberg

Medical Malpractice Action.  Langfitt Decl., Ex. 8.  With the exception of the deletion of

specification "e.," in paragraph 18, it makes the same allegations as in the Complaint. Venue was subsequently transferred to Marion County Circuit Court.[5]

On or about October 31, 2007, Bielenberg filed a Second Amended Complaint. Langfitt Decl., Ex. 9. In the Second Amended Complaint, the prior paragraph 19 was renumbered as paragraph 31 and otherwise remained unchanged. However, the prior paragraph 18 was renumbered as paragraph 30 and added that Dr. Larson was negligent in failing to "monitor" Bielenberg's advancing renal disease on September 20, 2005, and "a. in failing to specify any lab tests to evaluate the functioning of his remaining kidney since his review of plaintiff's medical records, medical history, and examination of plaintiff on November 22, 2004; . . . [and] f. in failing to more aggressively treat [Bielenberg's] hypertension." *Id*.

## IV.  **Request for Waiver of Lien/Subrogation Rights**

Bielenberg was represented by several attorneys during the course of the Bielenberg Medical Malpractice Lawsuit, including Mayfield, Linkous, and Michael Shinn ("Shinn"). In evaluating Bielenberg's case against Dr. Larson, Linkous consulted with both Bielenberg's treating neurologist and with a renal specialist. Linkous Decl., ¶ 3. Neither the treating doctors nor any medical experts retained on behalf of Bielenberg opined that his dialysis and kidney transplant could have been avoided if Dr. Larson had caught the blood tests earlier. *Id*, ¶ 5. From his review of the case and input from treating doctors and retained medical specialists, Linkous concluded that Bielenberg's case was not worth the $2.5 million originally alleged, but was instead only worth the pain and suffering associated with the brief delay in diagnosis and

---

[5] Following that transfer, Bielenberg named Rodney E. Orr, M.D., an Oregon Professional Corporation, d.b.a. Family Medical Group of Silverton (who was Dr. Larson's employer) as an additional defendant. Langfitt Decl., Ex. 9.

treatment, including the pain and suffering which resulted from Bielenberg's initial emergency

room procedures and the development of [REDACTED].  *Id*, ¶¶ 2-3.  Linkous suggested to

Bielenberg that he settle the case against Dr. Larson for $[REDACTED].  *Id*, ¶ 3.

Following that suggestion, Linkous contacted Bielenberg's insurance providers to resolve

any potential claims on the settlement funds.  *Id*, ¶ 4.  On July 22, 2008, Linkous spoke with Ann

Daniels ("Daniels") in ODS's Medical Claims Support Department.  Daniels Decl., ¶ 2 and

Ex. 1.  Linkous avers – and Daniels denies – that Daniels agreed ODS would not seek a lien

regarding costs paid by the Benefit Plan.  *Id*, ¶ 2 and Linkous Decls. (docket #67 & #78), ¶ 4.

The following day, July 23, 2008, Linkous wrote to ODS, explaining the settlement

posture of the case as follows:

> [Bielenberg] was seen by Dr. Larson from 2004 through 2005.
> During this time period Mr. Bielenberg's kidney disease
> deteriorated to the point of needing increased medical supervision
> by a nephrologist.  Unfortunately, Dr. Larson did not recognize this
> due to his failure to acknowledge certain abnormal laboratory test
> results in Mr. Bielenberg's blood work-up.
>
> Eventually, Mr. Bielenberg's condition deteriorated to end stage
> renal failure.  This resulted in hospitalization, peritoneal dialysis
> and eventually a kidney transplant.  According to medical experts,
> this outcome was predictable, and was unavoidable.  It was
> determined that Dr. Larson's errors regarding Mr. Bielenberg's
> blood work-up, though outside the standard of care, had very little
> impact on this prognosis.
>
> For this reason, it was not appropriate to continue the pursuit of
> this claim through trial.  Therefore extensive efforts were put into
> settlement of this case.  The primary claims remaining in the case
> were related to the pain and suffering which resulted from Mr.
> Bielenberg's development of [REDACTED].  We had some expert
> testimony that the [REDACTED] was anticipated, but was more
> severe than expected.  Because of its temporal onset with the initial
> hospitalization, the increased severity was arguably due to the

substantial period of time Mr. Bielenberg went unmonitored by a
nephrologist.

Even this claim was of limited value due to potential exacerbation
of the [REDACTED] by the onset of diabetes, a minimal Vitamin
B-12 level, and the side effects of certain immunosuppressant
pharmaceuticals used during post transplant recovery.

Given all of the above, it was determined that a settlement
representing no past, present, or future medical costs and only a
portion of the value of the pain and suffering, was appropriate.  It
was determined that an amount of $[REDACTED] would cover
Mr. Bielenberg's claims for pain and suffering as well as the
associated costs of pursuing his claims.  Dr. Larson accepted this
offer.

My purpose in this letter is to notify you of the settlement of this
claim and to request your acknowledgment that Mr. Bielenberg can
settle this matter free from any subrogation claim from your
company. . . .

I see no basis for a subrogation claim related to Dr. Larson's
treatment of Mr. Bielenberg.  I do see a very difficult path to a jury
verdict if we are not allowed to settle this matter as I propose.

Daniels Decl., Ex. 2, pp. 1-2.

Three days later, on July 25, 2008, Bielenberg and Dr. Larson's insurance carrier settled

the Bielenberg Medical Malpractice Action for $[REDACTED].  Mayfield Decl., ¶ 4; Langfitt

Decl., Ex. 10.[6]  Dr. Larson's liability insurer paid $158,434.52 to Bielenberg and the Law Office

of Brandon Mayfield.  That sum is now held in the Bielenberg Trust Account.

///

///

_____

[6]  Although the settlement documents were not executed until a few weeks later, Mayfield avers that the settlement
terms were reached on July 25, 2008, a statement that defendants have not challenged.  Two substantively identical settlement
agreements were executed by Bielenberg on August 21 and 29, 2008.  However, the earlier version bears no date on its first page
and was not signed by Bielenberg's attorney for approval as to form and content.  Langfitt Decl., Exs. 10-11.  Thus, it appears
that the July 25 settlement was formalized on August 29, 2008.

**V.  Post-Settlement Correspondence**

On August 11, 2008, over two weeks after the Bielenberg Medical Malpractice Action

settled, Daniels wrote a letter to Linkous stating that "ODS does not feel that it has sufficient

information to waive its subrogation rights at this time," enclosing the Third Liability section of

the Benefit Plan, and noting ODS's willingness "to review any additional information, including

expert testimony, that can support your comments that this outcome was predictable and

unavoidable, and that Dr. Larson's errors had little impact on Mr. Bielenberg's prognosis."

Daniels Decl., Ex. 3, p. 3; Linkous Decl., Ex. 13.  The letter also indicated that ODS would

reduce its lien and requested that $158,434.52 from the settlement be held in trust until the matter

was resolved.  *Id*.

The record is silent concerning the contacts between Bielenberg's attorneys and ODS

over the next few months.  In the first weeks of January and February 2009, Linkous wrote letters

to ODS formalizing his previous requests for an accounting of the benefits paid on behalf of

Bielenburg and challenging the conclusion that ODS had a valid lien under the Benefit Plan.

Linkous Decl., Ex. 14.  On February 6, 2009, ODS provided Bielenberg's attorney with a copy of

its claims ledger and a letter disagreeing with the assertion that ODS does not have a valid lien.

*Id*, Ex. 17.

Linkous forwarded the claims ledger to Walter H. Whitman, M.D., a physician in Salem,

Oregon, who apparently had previously reviewed the Beilenberg Medical Malpractice Case at the

request of one of the defense attorneys.  *Id*, Ex. 18, p. 3.  Dr. Whitman opined as follows:

///

///

In my opinion there was a clear delay in failing to read and correctly interpret the blood test results in September, 2005. This in turn led to a failure to diagnose the patient's advancing renal disease and to refer the patient to a nephrologist.

My feeling is that while there was a delay in establishing the diagnosis, this delay had minimal, if any, effect on the course of this patient's disease. The eventual need for dialysis and the subsequent need for a kidney transplant was present before the patient saw Dr. Larson for the first time. Therapy for hypertension with an ACE-inhibitor and therapy for hypercholesterolemia [*sic*] by Dr. Larson. These are treatments that would have been started by a nephrologists [*sic*] had the patient been referred.

Earlier establishment of the diagnosis of renal disease and referral to a nephrologist would have had minimal, if any, effect on the progression of this patient's disease. The need for dialysis would have been postponed for in [*sic*] weeks to a few months at the most.

In my opinion this patient would have been on dialysis before the end of 2006 even if the diagnosis had been established earlier. Charges for dialysis would have occurred in 2006 even without the delay in diagnosis.

*Id*, Ex. 18.

On June 11, 2009, Linkous sent an email to ODS's Government Programs Compliance Officer, Deanna Laidler ("Laidler"), forwarding Dr. Whitman's letter and noting that his opinion was consistent with the opinions of the experts retained in the Bielenberg Medical Malpractice Action. Mayfield Decl., Ex. 3 (mismarked as Ex. 1). Linkous again requested that ODS release its claim for subrogation rights on the settlement proceeds. *Id*.

///

///

///

Laidler in turn forwarded Dr. Whitman's letter to Daniels (ODS Medical Claims Support Department) and Maureen Woods ("Woods").[7] *Id*, Ex. 7.  Woods asked her to discuss the matter with ODS's medical director.  *Id*.

In late June 2009, Laidler spoke with Metro West's medical consultant, Dr. Johnson,[8] who "voiced his opinion that [Bielenberg] may have required dialysis and a transplant independent of the facts of [Dr. Larson]." *Id*, Ex. 8.  However, he asked Laidler to obtain copies of Bielenberg's records.  *Id*.  Laidler asked Linkous for the medical records from Dr. Larson and the subsequent treating provider in an email dated June 23, 2009.  *Id*, Ex. 3 (mismarked as Ex. 1), p. 1.  She noted that "we anticipate a review of no more than five (5) business days" after which "we will be able to provide you with a definitive response as to whether ODS will release its claim for subrogation rights on the settlement proceeds received in the case against Dr. Larson." *Id*.  Mayfield provided the medical records on July 1, 2009.  *Id*, p. 3.

Another month passed and on August 4, 2009, at 3:43 p.m., Jessica Bynum, ODS's Marketing Account Executive, sent an email to J.D. Fuiten ("Fuiten"), Metro West's President, copied to Laidler, stating that ODS had "confirmed with the National Practitioner Data Bank that the settlement amount was $[REDACTED]" and that:

///

///

///

_____

[7]  The record does not identify Woods's employer or job title.  However, she appears to work for ODS and asked Laidler to review the matter with one of ODS's medical directors.

[8]  The record does not identify Dr. Johnson's full name or exact role.  However, in an email to Linkous on June 23, 2009, ODS describes him as "one of our Medical Directors."  Mayfield Decl., Ex. 3 (mismarked as Ex. 1), p. 1.

The report contains the following information (none of which is exceedingly helpful to our case):

**Description of Judgment of Settlement, and any Conditions, Including Terms of Payment:** Compromised Settlement with no admission of fault, to avoid the risk and costs of further litigation, in the total amount of $[REDACTED].

**Outcome:** Minor Permanent Injury

**Description of the Allegations and Injuries or Illnesses Upon Which the Action or Claim Was Based:** Claim failure to diagnose advancing chronic renal insufficiency leading to related [REDACTED].

Laidler Decl., Ex. 6 (bold in original).

An hour and a half later, Laidler faxed a letter to Mayfield explaining that:

As a self-insured group, Mr. Bielenberg's claims were funded by Metro West, not by ODS, thus the consent of Metro West must be obtained before releasing any subrogation rights. We advised Metro West of your settlement offer . . . and also communicated the findings of our internal medical director. At their request, we are having the records reviewed by a second medical professional. We anticipate a response by the end of the week.

We expect to receive further direction from the group within the next day or two advising us as to how they wish us to proceed. The group has been advised that the total claims paid from 1/1/07 to 1/1/09 exceeded $272,000 and that ODS had already reduced the lien to $158,434.52 in recognition of the efforts expended in litigating the case.

 *          *          *

We are seeking to resolve this matter in an amicable fashion that recognizes the rights of both the member and the plan, but we are requesting additional time. As noted above, the records are being reviewed by another medical professional. I believe we will have the report back by the end of the week and could entertain further discussions with your office on August 12, 2009.

15 - REDACTED OPINION AND ORDER

> It is our understanding that the $[REDACTED] settlement reflects
> only amounts attributable to noneconomic damages, including pain
> and suffering, and does not include any past, present or future
> medical expenses, nor does it reflect any lost wages.  Please
> confirm that this is an accurate representation of the settlement.
>
> While we remain optimistic that a mutually satisfactory settlement
> can be reached, ODS will take whatever steps it deems necessary
> to preserve its lien and protect the interests of Metro West.

Mayfield Decl., Ex. 4, p. 1.

Mayfield responded the following day with a letter cataloguing the contacts between

Bielenberg's attorneys and ODS between July 22, 2008, and August 4, 2009, including the initial

telephone call with Daniels, ODS's subsequent letter asserting a lien, ODS's nearly six month

delay in providing the claims ledger and the substantive inadequacy of the claims ledger when

provided, Dr. Whitman's letter, and Mayfield's surprise at learning that Metro West, not ODS,

"yields the ultimate authority in deciding important policy decisions such as whether or not to

release subrogation rights for settlement proceeds for one of its own employees (a beneficiary

under the plan)," which he characterized as a "clear conflict of interest and breach of fiduciary

duty if Metro West is the plan sponsor, the plan administrator, funds the plan, and is the named

fiduciary."  *Id*, Ex. 6.

On August 12, 2009, Fuiten spoke with Laidler concerning his conversations with Skip

Freedman, M.D., Executive Medical Director of AllMed Healthcare Management, an

independent medical review company.[9]  *Id*, Ex. 11.  Fuiten asked Laidler to follow up with Dr.

Freedman.  *Id*.  Laidler's notes of her telephone conversation with Dr. Freedman state that:

---

[9]  *See* http://www.allmedmd.com/company/medical-staff-1/medical-staff (last accessed 9/23/2010).

> In his review of the claim, not so sure that the creatinine values listed indicate either that transplant required at that time or med mal on behalf of defendant.  Patient's condition may have been very treatable for a long time.  Patient own neglect – untreated hypertension (of which patient was aware) triggered this whole thing.  Does not believe need for transplant imminent – patient could have waited a few years.  Per Dr. Freedman, he consulted with some nephrologists on this case (informally).

*Id*.

A few days later, Dr. Freedman forwarded a message from "a [n]ephrologist friend in [F]lorida who knows nothing of the case" to Larry Boxman, Metro West's Director of Operations, who forwarded the message to Fuiten.  *Id*, Ex. 9.  Fuiten in turn forwarded the message on to Laidler.  *Id*.  The "Nephrologist friend," identified only as "Izu," opined that there were "a number of possibilities" relating to the progress of renal dysfunction, depending on whether the patient has well-controlled hypertension, poorly controlled hypertension and/or undiagnosed glomerulonephritis.[10]  *Id*.

The record reveals no further correspondence between Metro West or ODS and Bielenberg or his attorneys.

## DISCUSSION

### I.  Requests to Strike Evidence

Defendants ask this court to strike a number of paragraphs from the affidavits of Bielenberg and his attorneys (Mayfield and Linkous).  This court has carefully considered those

---

[10]  Glomerulonephritis is a type of kidney disease affecting the capillaries of the glomeruli, damaging the kidneys' ability to remove waste and excess fluids and characterized by hematuria, proteinuria, hypertension, and edema.  *See* http://www.mayoclinic.com/health/glomerulonephritis/DS00503 (last accessed 9/23/2010)

requests to strike certain evidence.  Rather than separately ruling on these evidentiary objections, the court will not consider any inadmissible evidence in considering the pending motions.

## II.  Motion to Amend

Bielenberg seeks to amend his complaint to assert a claim against both ODS and Metro West for penalties under 29 USC §1132(c)(1).

### A.  Legal Standard

Whether to grant or deny a motion to amend pleadings is a matter within the court's discretion.  *Pisciotta v. Teledyne Indus., Inc.*, 91 F3d 1326, 1331 (9th Cir 1996).  The policy favoring amendment, however, is to be applied with "extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F3d 1048, 1051 (9th Cir 2003)(citations omitted).  In evaluating the propriety of a motion for leave to amend, "we consider five factors:  (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether the plaintiff has previously amended his complaint."  *Nunes v. Ashcroft*, 375 F3d 805, 808 (9th Cir 2004), citing *Bonin v. Calderon*, 59 F3d 815, 845 (9th Cir 1995).  However, futility of an amendment alone justifies denial of a motion to amend.  *Id*.  Absent futility, prejudice to the opposing party is the most important factor.  *Jackson v. Bank of Hawaii*, 902 F2d 1385, 1387 (9th Cir 1990), citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 US 321, 330-31 (1971).

### B.  Penalty Request

The penalty provision cited by Bielenberg permits a court to impose a penalty of up to $100.00 per day against a plan administrator who "fails to meet the requirements of [29 USC § 1166(1) or (4), 1021(e)(1), 1021(f), or 1025(a)] with respect to a participant or beneficiary" or "fails or refuses to comply with a request for any information which such administrator is

required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator)."  29 USC § 1132(c)(1). Rather than citing one of the statutes specifically listed in 29 USC § 1132(c)(1), Bielenberg alleges that defendants violated a regulation, 29 CFR § 2560.503-1(h)(2)(iii), which sets forth minimum requirements for claims procedures. With regard to appeals of adverse benefit determinations, it requires that "a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  *Id*.

Bielenberg contends that on August 18 and November 16, 2009, he made written requests for the results of defendants' internal medical directors, but that defendants failed and refused to provide those documents until April 5, 2010, after this court ordered that the documents be produced and 227 days after Bielenberg's first request.  Accordingly, Bielenberg seeks to amend to request a penalty of $100.00 per day ($22,700.00) against Metro West and ODS for intentionally withholding those documents.  This court concludes that the amendment proposed by Bielenberg is futile and, therefore, denies his request to amend.

The problem with attempting to seek penalties under 29 USC § 1132(c)(1) for an alleged violation of 29 CFR § 2560.503-1(h)(2)(iii) is two-fold.  First, 29 USC § 1132(c)(1) only permits penalties against plan administrators.  Thus, only Metro West, not the claims administrator ODS, arguably could be held liable for a violation of that provision.  *See Sgro v. Danone Waters of N. Am., Inc.*, 532 F3d 940, 944-45 (9th Cir 2008) (indicating that "ERISA's remedies provision gives [claimants] a cause of action to sue a plan 'administrator' who doesn't comply with a 'request for . . . information,'", but dismissing penalty claims against claims administrator).

Second, the Third, Sixth, Seventh, and Eighth Circuits have held that 29 USC § 1132(c) may not be used to impose civil liability for the violation of 29 USC § 1133 or regulations implemented pursuant thereto. *Brown v. J.B. Hunt Transport Servs., Inc.*, 586 F3d 1079, 1089 (8th Cir 2009) ("[W]e agree with our sister circuits that a plan administrator may not be penalized under § 1132(c) for a violation of the regulations to § 1133") (citing cases); *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F3d 397, 405-06 (7th Cir 1996). These cases reason that the underlying regulation (29 CFR § 2560-503-1(h)) speaks only to the obligations of benefit plans (as opposed to plan administrators)[11] and is based on a statute (29 USC § 1133) which pertains only to claims for benefits.[12] As with the regulation at issue in *Brown*, the statutory authority for 29 CFR § 2560.503-1(h)(2)(iii) is 29 USC § 1133 which pertains to "claims for benefits." Similarly, as did the regulations at issue in *Wilczynski*, the regulation at issue here "speaks only to the obligations of benefit plans" and, therefore, "section 1132(c) cannot be used to impose civil liability for the violation of section 1133 alleged." *Wilczynski*, 93 F3d at 406.

Bielenberg cites *Sgro* as Ninth Circuit authority for the proposition that a violation of 29 CFR § 2560.503-1(h)(2)(iii) is a proper vehicle for assessing penalties under 29 USC § 1132(c)(1). However, *Sgro* concluded that the claimant named an improper party and, therefore, never reached the issue whether a penalty claim is appropriate based on the regulation

---

[11]  29 CFR § 2560.503-1(h)(2) provides that with respect to "[a]ppeal of adverse benefit determinations . . . Every *employee benefit plan* shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal. . . ." (emphasis added).

[12]  The "Scope and purpose" provision of 29 CFR § 2560.503-1 provides: "In accordance with the authority of . . . 29 U.S.C. § 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 USC § 1135 merely authorizes the enactment of regulations to implement ERISA, while § 1133 identifies the minimum claims procedures, including notices of denials and opportunity for an appeal of adverse decisions.

cited by Bielenberg.  This court is persuaded by the reasoning of the other circuits which have

actually addressed the issue and declines to impose liability under 29 USC § 1132(c) for a

violation of the regulations to 29 USC § 1133.

Moreover, an amendment to allege that defendants violated this regulation is futile for

another reason disclosed by the record.  Bielenberg made his initial request for records only to

ODS, the claims administrator, and did not make any request to Metro West, the plan

administrator, until after filing suit and then made the request to Metro West's attorney.  At that

point, Bielenberg's request for documents from a party to this lawsuit was governed by the

Federal Rules of Civil Procedure and not by 29 CFR § 2560.503-1(h)(2)(iii).

Accordingly, because the proposed amendment is futile, Bielenberg's Motion for Leave

to File Amended Complaint (docket #80) is denied.  This court need not, and does not, express

any opinion on the remaining factors considered in deciding motions to amend.

## III.  Summary Judgment

### A.  Jurisdictional Challenge

Bielenburg's summary judgment motion raises a jurisdictional challenge based on two

interrelated issues:  (1) ODS's fiduciary status; and (2) the nature of relief asserted by defendants.

ODS and Metro West relied on ERISA as the basis for removal to this court under 28 USC

§ 1441.  Notice of Removal, ¶¶ 4-5.  Under ERISA, a civil action may be brought:  "by a

participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any

provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable

relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms

of the plan."  29 USC § 1132(a)(3).  United States district courts have exclusive jurisdiction over

such actions.  29 USC § 1132(e)(1).  Bielenburg argues that ODS is not a plan fiduciary and that

defendants are seeking legal – not equitable – relief which is unavailable to fiduciaries under

ERISA rules and regulations.  Both of these arguments must be rejected.

### 1.  __ODS is a Fiduciary__

ERISA defines a plan fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he
> exercises any discretionary authority or discretionary control respecting
> management of a plan or exercises any authority or control respecting
> management or disposition of its assets, (ii) he renders investment advice
> for a fee or other compensation, direct or indirect, with respect to any
> moneys or other property of such plan, or has any authority or
> responsibility to do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

29 USC § 1002(21)(A).

Bielenburg contends that only MetroWest, as the plan sponsor, is the plan fiduciary.

According to Bielenberg, ODS is merely a third-party, non-fiduciary claims administrator hired

by the Benefit Plan to perform ministerial functions, such as those identified in 29 CFR

§ 2509.75-8, D-2.  As a result, Bielenberg contends that ODS has simply administered claims

and applied policy rules, which is not a fiduciary function entitled to deference.  In response,

ODS asserts that it administered the Benefit Plan and performed discretionary functions with

respect to the Third-Party Liability recovery provisions and that those functions are sufficient to

establish that it is a fiduciary under the Benefit Plan with respect to those provisions.[13]

---

[13]  ODS also argues that Bielenberg has admitted that ODS was a fiduciary by stating in his Answer that "ODS administered the plan in making the decision to waive the Plan's purported lien rights then to later assert those lien rights" and that "both ODS and METROWEST appear to be the Plan Administrators."  Plaintiff's Answer to Counterclaim (docket #8), ¶ 3. However, a statement that ODS "appears to be" a Plan Administrator is not an admission that it in fact was one and, in any event, Bielenberg later amended his pleading to specify that ODS was not a plan administrator.  Plaintiff's Amended Answer to Defendant ODS's Amended Counterclaims (docket #23), p. 3.

By definition, the plan administrator is the person specifically designated by the plan document or, in the absence of such designation, the plan sponsor.  ERISA § 3(16)(A), 29 USC § 1002(16)(A); *Pegram v. Herdrich*, 530 US 211 (2000).  Although a plan may have numerous persons "with discretionary authority or discretionary responsibility" in its administration, it generally designates only one person as the plan "administrator."

However, a plan may have more than one fiduciary.  In fact, ERISA mandates that a written plan document must provide for "one or more named fiduciaries who shall have authority to control and manage the operation and administration of the plan."  29 USC § 1102(a)(1).  Alternatively, the named fiduciary may be identified by the plan sponsor pursuant to a procedure specified in the plan.  29 USC § 1102(a)(2).  Named fiduciaries can delegate certain fiduciary functions to other persons.  29 USC § 1005(c)(1).  There is no limit to the number of named fiduciaries.  29 CFR § 2509.75-5, FR-2.

ERISA defines fiduciary conduct "in functional terms of control and authority over the plan" without regard to the title or position.  *Mertens v. Hewitt Assocs.*, 508 US 248, 262 (1993).  The key element in determining whether a party performing administrative services is a fiduciary is whether that person possesses either *de facto* or *de jure* discretion in the performance of such tasks.  Thus, when a health insurer or third-party administrator is given discretionary authority to grant or deny claims, that person acts as a fiduciary in performing that function.  *Aetna Life Ins. Co. v. Bayona*, 223 F3d 1030 (9th Cir 2000), *as amended on denial of reh'g en banc* (9th Cir 2003).  On the other hand, a party performing purely ministerial functions for a plan, such as

preparing financial reports, does not possesses the requisite discretionary authority to be a fiduciary.  *See Pacificare v. Martin*, 34 F3d 834, 837 (9th Cir 1994); 29 CFR § 2509.75-8.[14]

The line between a party acting in a discretionary or ministerial capacity is not always clear.  For example, a party that merely makes nonbinding recommendations respecting coverage determinations is unlikely to be a fiduciary.  *Harris Trust & Sav. Bank v. Provident Life & Acc. Ins. Co.* 57 F3d 608, 613-14 (9th Cir 1995) (insurance company/claims administrator not a fiduciary when administering claims under a sponsor's direction); *Kaniewski v. Equitable Life Assur. Soc'y of the United States*, 991 F2d 795, 1993 WL 88200, *4, 17 EB Cases 1137 (6th Cir 1993) (unpublished) (insurance company not a fiduciary where employer retained final authority to deny claims).  However, an insurer-administrator who contractually agrees to perform only ministerial functions is still a fiduciary to the extent that it determines whether a claim was "doubtful" and therefore in need of review by the employer.  *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F3d 1415 (9th Cir 1997), *cert denied*, 522 US 1068 (1998).

Several courts have specifically held that various entities act as fiduciaries when seeking to enforce a plan's reimbursement or subrogation rights.  *Administrative Comm. v. Gauf*, 188 F3d

_____

[14]   Department of Labor regulations provide that persons who perform the following administrative functions will not be deemed a fiduciary with respect to an employee benefit plan:

(1) Applications of rules determining eligibility for participation or benefits;
(2) Calculation of services and compensation credits for benefits;
(3) Preparation of employee communications material;
(4) Maintenance of participants' service and employment records;
(5) Preparation of reports required by governmental agencies;
(6) Calculation of benefits;
(7) Orientation of new participants and advising participants of their rights and the options under the plan;
(8) Collection of contributions and application of contributions as provided in the plan;
(9) Preparation of reports concerning participants' benefits;
(10) Processing of claims;
(11) Making recommendations to others for decisions with respect to plan administration.

29 CFR § 2509.75-8, D-2.

767, 770-72 (7th Cir 1999) (holding that ERISA plan administrator was fiduciary where it

exercised discretionary authority under the plan and was asserting a claim for equitable relief

under the reimbursement clause of plan); *Health Cost Controls of Ill., Inc. v. Washington*, 187

F3d 703, 708-11 (7th Cir 1999) (holding that assignee of employee-sponsored health plan's

reimbursement claims was fiduciary where it had a discretionary role under the plan and asserted

an equitable right that the plan entitled it to reimbursement as subrogee); *Blue Cross & Blue*

*Shield of Ala. v. Sanders*, 138 F3d 1347, 1353 (11th Cir 1998) (stating that "[c]laims

administrators are fiduciaries if they have the authority to make ultimate decisions regarding

benefits eligibility," and that an equitable right to specific performance is implied where legal

remedies are inadequate because ERISA preemption precludes claims administrator from suing

defendants at law in state court); *Biomet Inc. Health Benefits Plan v. Black*, 51 F Supp2d 942,

947 (ND Ind 1999).

Here the Benefit Plan expressly grants discretionary authority and control to ODS over

the functions of seeking reimbursement and subrogation.  Therefore, as the claims administrator,

ODS clearly is a named fiduciary under the Benefit Plan.  However, with respect to Bielenberg's

request for a lien waiver, it did not actually exercise that discretionary authority, but instead

referred the request to Metro West for the final decision.

At the hearing on the motions, ODS referred to its agreement with MetroWest which

presumably dictates the claims administration procedures and practices to be followed by ODS.

However, the specific terms of that agreement are unknown since it is not part of the record.  The

record reveals only that MetroWest exercised the final authority with respect to granting or

denying Bielenberg's lien waiver request.  That fact, however, does not mean that ODS exercised

only a ministerial function in that regard, thus relieving it of any fiduciary duty. ODS still had

the power to made decisions about plan interpretation by determining whether or not to refer the

lien waiver issue to Metro West. This situation is similar to *IT Corp.* where the contract required

the claims administrator to refer disputed cases back to the plan administrator. Despite this

limited role of the claims administrator, the Ninth Circuit held that it could still be a fiduciary:

> But it is hard to say that [the claims administrator] has no power to make
> decisions about plan interpretation, because [it] has to interpret the plan to
> determine whether a benefits claim ought to be referred back. No claim is
> likely to be known to or disputed by [the plan administrator] unless and
> until [the claims administrator] decides that it is questionable or doubtful
> enough to be worth referring back to [the plan administrator] for
> instructions.

*IT Corp.*, 107 F3d at 1420.

In addition, the Ninth Circuit concluded that the claims administrator may be a fiduciary

because it "controlled the money in the plan's bank account." *Id* at 1421.

> The words of the ERISA statute, and its purpose of assuring that people
> who have practical control over an ERISA plan's money have fiduciary
> responsibility to the plan's beneficiaries, require that a person with
> authority to direct payment of a plan's money be deemed a fiduciary.

*Id*.

For the same two reasons, ODS is a fiduciary in this case. Here it is clear from the record

that ODS had the power to interpret the Benefit Plan to determine whether to refer Bielenberg's

lien waiver request to MetroWest. In addition, as far as the record reveals, ODS had control over

the Benefit Plan's assets. Therefore, ODS is a fiduciary with the requisite standing to bring an

ERISA claim.

///

26 - REDACTED OPINION AND ORDER

2.  <u>**The Relief Sought is Equitable**</u>

Bielenburg also argues that the relief defendants seek is not equitable in nature.  As a result, he contends that the relief that ODS and Metro West seek is inappropriate and without jurisdictional basis because it is not "other appropriate equitable relief" permitted by 29 USC § 1132(a)(3).

Under ERISA, fiduciaries may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 USC § 1132(a)(3).  Bielenberg contends that defendants are employing creative pleading in an effort to dupe this court into believing that what in reality is a claim for damages for breach of contract appears to be a claim for "other appropriate equitable relief" in the form of a constructive trust.

The phrase "other appropriate equitable relief" is limited to relief that was "typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)."  *Mertens*, 508 US at 256-57 (emphasis omitted).  Money damages, in contrast, are "the classic form of *legal* relief."  *Id* (citations omitted; emphasis in original).  Thus, equitable relief is construed to preclude awards for compensatory or punitive damages.  *Id*.

If defendants sought to impose personal liability on Bielenberg or on the Bielenberg Trust Account, then the First Counterclaims would be considered legal actions for breach of contract and not authorized under ERISA:

> In cases in which the plaintiff could not assert title or right to
> possession of particular property, but in which nevertheless he
> might be able to show just grounds for recovering money to pay for

some benefit the defendant had received from him, the plaintiff had a right to restitution *at law* through an action derived from the common-law writ of assumpsit. In such cases, the plaintiff's claim was considered legal because he sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money. Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.

*            *            *

Because petitioners are seeking legal relief – the imposition of personal liability on respondents for a contractual obligation to pay money – § 502(a)(3) does not authorize this action.

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 US 204, 213 (2002) (citations and internal punctuation omitted; emphasis in original).

In this case, rather than seeking to impose personal liability on Bielenberg or the Bielenberg Trust Account in the form of a legal action for breach of contract, defendants seek a constructive trust over disputed funds currently held in the Bielenberg Trust Account. This type of claim falls squarely within the type of claim characterized as seeking "equitable relief" and, therefore, is permitted under 29 USC § 1132(a)(3) as discussed in *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 US 356 (2006).[15] Accordingly, this court rejects Bielenberg's jurisdictional

---

[15] *Sereboff* rejected the reasoning of the case on which Bielenberg relies, *Westaff (U.S.A.), Inc. v. Arce*, 298 F3d 1164 (9th Cir 2002). *Sereboff*, 547 US at 360 n.1, 362-66.

challenges and finds that defendants' First Counterclaims are appropriately asserted under

29 USC § 1132(a)(3).[16]

**B.  Standard of Review**

**1.  *De Novo* versus Abuse of Discretion**

The parties dispute the standard of review applicable in this case.  In order to properly

evaluate their arguments, this court must first clarify what this case is *not* about.  This case does

*not* involve a claim for a denial of benefits.  There is no issue in this case that defendants failed

or refused to pay for any medical care to which Bielenberg was entitled under the terms of the

Benefit Plan.  Instead, this case concerns who is entitled to the settlement proceeds received from

Dr. Larson's insurer which are currently held in the Bielenberg Trust Account.  Bielenberg filed

this case in state court seeking declaratory relief that defendants improperly interpreted and

construed the Third-Party Liability provisions of the Benefit Plan and that defendants have no

enforceable rights under those provisions.  Thus, this court focuses on those provisions of the

Benefits Plan and need not, and will not, consider Bielenberg's arguments that he was denied

certain procedural protections pertaining to a denial of benefits.

Over a decade ago, the Supreme Court held that denials of benefits under ERISA are

reviewed *de novo* by the district court "unless the benefits plan gives the administrator or

fiduciary discretionary authority to determine eligibility for the benefits or to construe the terms

of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 115 (1989).  This standard

---

[16] Defendants' Second Counterclaims allege breach of contract as an alternative to their First Counterclaims in the event that ODS is not a fiduciary or an equitable claim is otherwise unavailable under ERISA.  ODS's Amended Answer (docket #20), p. 7; Metro West's Amended Answer (docket #28), pp. 8-9.  Because this court concludes that ODS is a fiduciary and that a claim for constructive trust is available, the Second Counterclaims are unnecessary, and defendants' remedy is for equitable relief under 29 USC § 1132(a)(3).

applies not only in the context of denials of benefits decisions, but also in the context of other

ERISA decisions, including those involving reimbursement and subrogation rights.[17]  Thus, this

court applies the *Firestone* methodology to this case.

In order for a plan "to alter the standard of review from the default of *de novo* to the more

lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator.

The essential first step of the analysis, then, is to examine whether the terms of the ERISA plan

unambiguously grant discretion to the administrator."  *Abatie v. Alta Health & Life Ins. Co.*, 458

F3d 955, 963 (9th Cir 2006) (*en banc*) (citation omitted).  Thus, this court must first examine the

terms of the Benefit Plan to determine the extent of any discretion afforded to Metro West and

ODS in the context of the Third-Party Liability provisions.

Metro West is the plan sponsor, plan administrator, and the named fiduciary under the

terms of the Benefit Plan.  Laidler Decl., Ex. 1, p. 10.  ODS is the claims administrator of the

Benefit Plan.  *Id*, p. 9.  The Benefit Plan includes detailed provisions concerning "Benefits

Available From Other Sources," including a section on Third-Party Liability which gives ODS

---

[17]  *See Moore v. CapitalCare, Inc.*, 461 F3d 1, 11 (DC Cir 2006) (citing cases and noting that "[o]ther courts apply a similar standard of review in an ERISA suit brought by a fiduciary to enforce a subrogation provision"); *Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried and Non-Bargaining Hourly Employees v. Whitehurst*, 102 F3d 1368, 1373 (5th Cir 1996) (footnote and citations omitted) ("Federal courts have consistently applied *Firestone's* deference principles to actions concerning benefit determinations brought not only by participants but also by ERISA plans and, in particular, claims involving ERISA plans' assertions of purported reimbursement and subrogation rights"); *Cutting v. Jerome Foods, Inc.*, 993 F2d 1293, 1295-96 (7th Cir), *cert denied*, 510 US 916 (1993); *Baxter by and through Baxter v. Lynn*, 886 F2d 182, 187-88 (8th Cir 1989); *Murzyn v. Amoco Corp.*, 925 F Supp 594, 598 (ND Ind 1995) ("While the current matter involves the interpretation of a subrogation clause rather than a denial of benefits, the *Firestone* principle of review still has applicability to this case"); *Trustees of Hotel Employees and Restaurant Employees Int'l Union Welfare Fund v. Kirby*, 890 F Supp 939, 942 (D Nev 1995) ("Although this is not a denial of benefits case, the same rules should apply); *Saunders v. Scheideler*, 816 F Supp 1338, 1342 (WD Wis 1993) ("Although this case does not involve a denial of benefits, the Court's reliance on general principles of trust law in establishing the standard of review of a trustees' plan interpretation supports the applicability of *Firestone* to this case"), *aff'd* 25 F3d 1053 (7th Cir 1994); *Germany v. Operating Engineers Trust Fund*, 789 F Supp 1165 (DDC 1992) (applying *Firestone* deferential standard of review in case involving interpretation of a plan's subrogation rights).

the "sole discretion to interpret and construe these reimbursement and subrogation provisions." *Id*, pp. 9, 11.

Despite this express grant of discretion, Bielenberg counters that, for a variety of reasons, this court must apply a *de novo* standard of review. However, a review of the case law reveals that a discretionary standard of review applies, albeit one tempered by weighing other factors, including a structural (contract imposed) conflict of interest.

Bielenberg intermittently contends that defendants' failures to deliver copies of the Benefit Plan documents to him until August 2009 and to credit his reliable evidence merit application of a *de novo* standard of review. While consideration of those factors may impact the manner in which the decision is reviewed for abuse of discretion, Supreme Court precedent makes clear that they do not alter the applicable standard of review:

> We turn to the question of "how" the conflict we have just identified should "be taken into account on judicial review of a discretionary benefit determination." In doing so, we elucidate what this Court set forth in *Firestone*, namely, that a conflict should "be weighed as a 'factor in determining whether there is an abuse of discretion.'"

> We do not believe that *Firestone's* statement implies a change in the *standard* of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion. We see no reason to forsake *Firestone's* reliance upon trust law in this respect.

*Metropolitan Life Ins. Co. v. Glenn*, 554 US 105, — , 128 S Ct 2343, 2350 (2008) (internal citations omitted; emphasis in original).

Accordingly, this court concludes that an abuse of discretion standard of review applies to the claims at issue in this case, but that the court must weigh some of the factors identified by Bielenberg in determining whether there has been an abuse of discretion.

### 2. <u>No Consideration of Factors Specific to Benefits Denials Claims</u>

Bielenberg raises several factors which he contends modify the standard of review, including defendants' failure to deliver a copy of the plan or summary plan description, irregularities in the appeal process including a failure to timely respond to his request for reconsideration of the lien assertion, and a conflict of interest inherent in the arrangement between ODS and Metro West concerning payment of claims. In portions of those arguments, Bielenberg asserts that this case involves a claim for a denial of benefits, as opposed to a case involving reimbursement or subrogation rights. However, as previously noted, this case does not involve a claim for denial of benefits. In addition, it does not involve a situation where defendants refused to pay benefits unless and until Bielenburg signed a subrogation agreement, as in the case Bielenberg cites, *Germany v. Operating Engineers Trust Fund of Washington D.C.*, 789 F Supp 1165 (DDC 1992). Instead, this case involves a third-party recovery claim. Bielenberg received benefits from ODS and makes no claim that ODS owes him benefits. Instead, the contest is over monies received by Bielenberg from a third party (Dr. Larson's insurer). Therefore, to the extent the factors are premised upon an assertion that this case involves a claim for an improper benefits denial, they need not be considered.

### 3. <u>Conflict of Interest</u>

Where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there

is an abuse of discretion." *Firestone*, 489 US at 115.  Abuse of discretion review is required

"whenever an ERISA plan grants discretion to the plan administrator, but a review informed by

the nature, extent, and effect on the decision-making process of any conflict of interest that may

appear in the record.  This standard applies to the kind of inherent conflict that exists when a plan

administrator both administers the plan and funds it, as well as to other forms of conflict."

*Abatie*, 458 F3d at 967.  Courts must "temper the abuse of discretion standard with skepticism

'commensurate' with the conflict."  *Nolan v. Heald College*, 551 F3d 1148, 1153 (9th Cir 2009),

quoting *Abatie*, 458 F3d at 959, 965, 969.

   The importance that courts attach to the conflict depends on the "conflict's nature, extent,

and effect on the decision-making process."  *Id* at 1153, quoting *Abatie*, 458 F3d at 970

(remaining citation omitted).  A variety of factors may be considered, including the monetary

conflict (structural conflict of interest), the emphasis by the administrator of evidence favorable

to a denial of benefits and de-emphasis of unfavorable evidence, inconsistent explanations for

claims denials, the presence of procedural irregularities in the claims process, and evidence

which tends to show bias or bad faith.  *See Metropolitan Life Ins. Co.*, 554 US at — , 128 S Ct at

2351-52 (financial incentives, emphasis of evidence favoring denial of benefits, failure to

provide independent experts all relevant evidence); *Nolan*, 551 F3d at 1155 (bias); *Abatie*, 458

F3d at 968 (inconsistent reasons for claims denial, failure to adequately investigate, failure to

credit reliable evidence, making decisions against the weight of the evidence); *Friedrich v. Intel

Corp.*, 181 F3d 1105, 1110 (9th Cir 1999) (procedural irregularities in initial claims process and

unfair appeal process); *Lang v. Long Term Disability Plan*, 125 F3d 794, 797 (9th Cir 1997)

(inconsistent reasons).  The reviewing court must make "something akin to a credibility

determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie*, 458 F3d at 969.

Bielenberg identifies two factors which do not depend on an improper characterization of the claims in this case and which are relevant and must be weighed in reviewing defendants' decision: (1) ODS's structural conflict of interest and deferral to Metro West regarding the decision to pursue reimbursement, both apparently driven by the terms of the contract between ODS and Metro West; and (2) defendants' failure to credit reliable evidence provided by Bielenburg.[18]

### a.  **Contractual Arrangement**

Although ODS has "sole discretion" to interpret and construe the reimbursement provisions under the express written terms of the Benefit Plan, it is undisputed that ODS operated as the claims administrator under the terms of a separate contract with Metro West. That contract apparently contains terms which alter ODS's authority in significant ways.  The contractual arrangement between Metro West and ODS includes a "stop loss" provision which obligates ODS to pay claims which exceed $150,000.00.  *See* Mayfield Decl., Ex. 10.  ODS acknowledges that this presents a structural conflict of interest because ODS "both decides whether claimants will receive benefits and is responsible for paying benefits when they are

---

[18]    Bielenberg also asserts that he was not provided with a copy of the entire Benefit Plan until after August 6, 2009, following repeated requests by his attorney.  Mayfield Decl., ¶ 3.  Citing *Gertjejansen v. Kemper Ins. Co.*, 2008 WL 1787484 (9th Cir 2008), an unpublished memorandum opinion, he asserts that defendants' failure to deliver the Benefits Plan is a procedural irregularity which precludes any deferential review regarding interpretation of the Benefits Plan prior to delivery. This argument is flawed for two reasons.  First, although unpublished dispositions of the Ninth Circuit issued after January 1, 2007, may be cited, they are not precedential except when relevant under the doctrine of law of the case or rules of claim or issue preclusion.  Ninth Circuit Rule 36-3(a), (b).  Thus, *Gertjejansen* is not binding authority.  Second, even if *Gertjejansen* were binding, to the extent that it holds that the standard of review is altered based upon those factors which must be weighed under a *Firestone* analysis, it was abrogated by *Metropolitan Life Ins. Co.*, 554 US at — , 128 S Ct at 2350.

awarded." ODS's Memorandum in Opposition to Plaintiff's and Counterclaim Defendant's

Motions for Summary Judgment (docket #90), p. 10. The fact that ODS paid over $100,000.00

for medical care received by Bielenberg must be weighed in the court's analysis of its decision to

assert a lien for reimbursement.

The contractual arrangement between ODS and Metro West also apparently requires any

release of subrogation or reimbursement rights to be approved by Metro West, as evidenced in

the August 4, 2009 letter from ODS to Mayfield. Mayfield Decl., Ex. 4 ("As a self-insured

group, Mr. Bielenberg's claims were funded by Metro West, not by ODS, thus the consent of

Metro West must be obtained before releasing any subrogation rights."). The letter makes clear

that ODS deferred to Metro West. *Id* ("We advised Metro West of your settlement offer . . . and

also communicated the findings of our internal medical director. At [Metro West's] request, we

are having the records reviewed by a second medical professional."). Thus, although the Benefit

Plan states that ODS has the "sole discretion" to interpret and construe the subrogation and

reimbursement provisions, ODS clearly deferred to Metro West, apparently due to a contractual

obligation to do so.

The record does not reveal anything further about the nature of the financial arrangements

between ODS and Metro West. The record is similarly silent on any previous interpretations of

the Third Party Liability provision of the Benefit Plan. Bielenberg was apparently the only

Benefit Plan beneficiary whose claims exceeded the cap on Metro West's self-insurance during

2007. *Id*, Ex. 10. As a result of their contractual relationship, both Metro West and ODS were

on the hook for over $100,000.00 in claims less than three months into their relationship.

Neither ODS nor Metro West has provided affirmative evidence to demonstrate that they took

steps to minimize the conflict of interest through the structure of their decision-making process. *See Abatie*, 458 F3d at 969 n.7.  At a minimum, these factors militate that this court look askance at ODS's decision.

**b.  Failure to Credit Reliable Medical Evidence**

Another relevant consideration is ODS's failure to credit the medical evidence provided by Bielenberg.  Plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence."  *Black & Decker Disability Plan v. Nord*, 538 US 822, 834 (2003).

From their earliest contact, Bielenberg's attorneys advised ODS that Bielenberg's deterioration into end stage kidney failure, "result[ing] in hospitalization, peritoneal dialysis and eventually a kidney transplant . . .was predictable, and was unavoidable."  Daniels Decl., Ex. 2, p. 1; *see also*, *id*, Ex. 1 and Ex. 3, p. 3 (noting that Linkous had advised ODS that "Dr. Larson's errors had little impact on Mr. Bielenberg's prognosis").  Nothing in the record indicates that ODS received any information to counter the lack of a causal connection between Dr. Larson's alleged negligence and Bielenberg's eventual need for dialysis and a kidney transplant.  To the contrary, the available information indicated that Bielenberg's progression into kidney failure was a foregone conclusion, although there were a number of different possibilities as to how long that progression might have taken.  Dr. Whitman, who had reviewed the Bielenberg matter both on behalf of Dr. Larson's defense counsel prior to settlement of the Bielenberg Medical Malpractice Action, and at Bielenberg's attorneys' request after they received a copy of the claims ledger in February 2009, opined that Dr. Larson's failure to correctly interpret the September 2005 blood test results "had minimal, if any, effect on the course of [Bielenberg]'s disease."  Linkous Decl., Ex. 18, p. 3.  Dr. Johnson, with whom ODS consulted at Metro West's

request in June 2009, "voiced his opinion that [Bielenberg] may have required dialysis and a transplant independent of the facts of [Dr. Larson]." Mayfield Decl., Ex. 8. The eleventh-hour informal consultation with Dr. Freedman in August 2009, over a year after Bielenberg's attorneys first raised the issue with ODS, produced nothing to bolster a causal connection. Dr. Freedman was "not so sure" that Dr. Larson had committed medical malpractice at all, much less caused the need for a kidney transplant. *Id*, Ex. 11. And "Izu," Dr. Freedman's "Nephrologist friend in [F]lorida," who "kn[ew] nothing of the case" simply commented on the length of time it might have taken for a hypothetical patient's condition to deteriorate into end stage renal failure depending on whether the patient had controlled or poorly controlled hypertension, or undiagnosed glomerulonephritis. *Id*, Ex. 9.

In short, the record reveals nothing to support the conclusion that Bielenberg's need for a kidney transplant resulted from the delay in diagnosis and treatment attributable to the negligence of Dr. Larson as alleged in the Bielenberg Medical Malpractice Action.

### c. **Failure to Investigate**

Finally, although not discussed by the parties, this court notes that it "may weigh a conflict more heavily" for a variety of other reasons, including an administrator's failure "adequately to investigate a claim or ask the plaintiff for necessary evidence." *Abatie*, 458 F3d 955, 968-69 (citations omitted). ODS was notified of Bielenberg's plans to settle the Bielenberg Medical Malpractice Action on July 22, 2008. ODS did not provide Bielenberg with the claims ledger until February 6, 2009. Upon receiving the letter from Dr. Whitman on June 11, 2009, ODS consulted with Dr. Johnson, then asked for and received Bielenberg's medical records on July 1, 2009. ODS apparently never obtained a formal opinion from either Dr. Johnson,

Dr. Freedman, or Dr. Freedman's "Nephrologist friend," "Izu."  Instead, it relied on casual conversations with (or hearsay statements from) these physicians and simply quoted a single sentence in the Third-Party Liability section of the Benefit Plan as its explanation to Bielenberg of its decision that it had a right to recovery from the settlement proceeds.  The net effect is that nearly half of Bielenberg's settlement funds were held captive for over a year before Bielenberg finally filed this case to resolve the matter.  The record also seems to indicate that ODS took no action unless and until repeatedly prodded by Bielenberg, and when it did take action, gave no explanation of its reasoning.

### 4.  Conclusion

This court is bound to consider whether ODS abused its discretion in interpreting the Benefit Plan in light of the following factors.  First, ODS operated under a structural conflict due to its own payment of claims on behalf of Bielenberg.  Second, ODS also deferred to Metro West, which operated under a similar – if not more significant – conflict.  Additionally, the only medical evidence in the record supports Bielenberg's assertion that he was unable to prove a causal link between Dr. Larson's negligence and the dialysis and kidney transplant that accounted for the bulk of Bielenberg's medical charges.

### C.  Interpretation of the Third-Party Liability Provisions

Although beyond the scope of the Order limiting the pending motions to the standard of review, ODS and Metro West seek summary judgment that the Benefit Plan has a valid lien against the proceeds of Bielenberg's settlement with Dr. Larson.  Essentially, their contention is twofold.  First, focusing on the language of the pleadings in the Bielenberg Medical Malpractice Action and the broad terms of the settlement agreement, they argue that the settlement

necessarily included all components of Bielenberg's treatment, including his dialysis and kidney transplant. Folding in a judicial estoppel argument, defendants contend that Bielenberg may not now take an inconsistent position by contending that Dr. Larson did not cause Bielenberg's kidney failure and need for dialysis and transplant. Second, turning their focus to the text of the Third-Party Liability provisions of the Benefit Plan, defendants contend that they are entitled to reimbursement of all amounts they paid on Bielenberg's behalf irrespective of how the settlement is characterized. After an exhaustive review of the record, considered in light of this court's obligation to weigh the factors described above, this court concludes that ODS abused its discretion in asserting a lien for all amounts it paid on behalf of Bielenberg, irrespective of the lack of a causal connection between the amounts paid and negligence by Dr. Larson.

## 1. **Judicial Estoppel**

Citing Bielenberg's allegations in the Bielenberg Medical Malpractice Action, ODS contends that Bielenberg should be judicially estopped from claiming that Dr. Larson is not a "Third Party" as defined by the Benefit Plan. Specifically, ODS asserts that Bielenberg's allegations regarding the results of Dr. Larson's negligence, constitutes an allegation that he suffered an aggravation of his renal disease due to Dr. Larson's negligence that is inconsistent with his assertion in this case that he did not. Accordingly, ODS contends that Bielenberg is "playing fast and loose with the courts by claiming that Dr. Larson caused an aggravation of his injuries in order to obtain a favorable settlement in one proceeding, and then taking a directly contrary position in this court to prevent ODS from enforcing its rights under the Benefit Plan." ODS's Memorandum in Support of its Motions for Partial Summary Judgment (docket #53), p. 7.

The parties vehemently dispute the scope of the allegations in paragraph 31 in the Second Amended Complaint in the Bielenberg Medical Malpractice Action (¶ 19 in prior pleadings) discussing the results of Dr. Larson's negligence.  ODS insists that this paragraph alleges that Dr. Larson's negligence resulted in an aggravation of Bielenberg's kidney disease and, therefore, fits squarely within the Benefit Plan's definition of a "Third Party" as an individual "responsible for . . . the aggravation of an injury or illness."  Mayfield contends that the allegations of the pleadings were carefully crafted and do not allege that Dr. Larson's negligence caused either Bielenberg's need for dialysis and a kidney transplant or the [REDACTED].

The difficulty is that paragraph 31 of the Second Amended Complaint begins with a complex run-on sentence that does not specify exactly how Bielenberg's renal disease was "worsen[ed]" by each of the multiple negligent acts by Dr. Larson alleged in the preceding paragraph.  At the outset, Bielenberg sought $2.5 million in damages and was engaged in discovery with an eye toward linking Dr. Larson's negligence to all of the symptoms, treatment and sufferings he experienced beginning with his hospital admission in April 2006.  As specified in the pleadings, Bielenberg's renal disease went undiagnosed until April 29, 2006, by which time his kidney had failed.  The request for $2.5 million was, in part, premised upon medical and hospital expenses totaling over $300,000.00, a figure which undoubtedly included many or all of the costs associated with the transplant surgery.

The first sentence of the critical paragraph could be interpreted as not linking Dr. Larson's negligence to the kidney transplant surgery by reading the phrase "by which time his kidney had failed" as only modifying the clause "thus requiring him to undergo numerous surgeries for implantation of fistulas and catheters, and required him to undergo a regime of

hemodialysis, and eventually a kidney transplant surgery."  However, the request to recover the costs relating to the kidney transplant surgery, combined with the second sentence of paragraph 31 which seeks damages for "[t]he effects of the kidney failure, and the subsequent treatments," makes it difficult to narrowly read the allegations as excluding a contention that Dr. Larson was responsible for the kidney transplant surgery.

Be that as it may, it is evident from the record that Bielenberg's litigation posture significantly altered by mid-2008.  Unable to unearth proof that Dr. Larson's negligence caused or aggravated Bielenberg's kidney disease to the point of requiring dialysis and a transplant, Linkous suggested to Bielenberg that he settle his case against Dr. Larson for $[REDACTED]. This figure was "based on the pain and suffering which resulted from [Bielenberg]'s initial emergency room procedures, and the development of [REDACTED]."  Linkous Decl., ¶ 3. Dr. Larson and his insurer agreed to [REDACTED] and signed settlement documents.  By August 4, 2009, ODS and Metro West learned that Dr. Larson's settlement with Bielenberg was similarly characterized in a report to the National Practitioner Data Base by Dr. Larson's insurer as a claim for "failure to diagnose advancing chronic renal insufficiency leading to related [REDACTED]" causing a "minor permanent injury."  Laidler Decl., Ex. 5, p. 3 and Ex. 6. However, the pleadings in the Bielenberg Medical Malpractice Action were never amended to reflect this more limited claim, and the settlement documents contain a broad release of "any and all known or unknown claims, for bodily and personal injuries to [Bielenberg] or any future claim of [Bielenberg] . . . which has resulted or may result from the medical care and treatment rendered to [Bielenberg] by [Dr. Larson]."  Langfitt Decl, Ex. 10, p. 1.

Judicial estoppel is an equitable doctrine invoked by a court at its discretion.  *Russell v. Rolfs*, 893 F2d 1033, 1037 (9th Cir 1990).  Although the "circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle," factors commonly considered include:  (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) "whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *New Hampshire v. Main*, 532 US 742, 750 (2001) (citations and internal quote marks omitted).

The amended pleading filed by Bielenberg in Marion County does contain additional allegations which indicate that Bielenberg had "signs of risk to his remaining kidney," "advancing and chronic renal insufficiency" which presented "foreseeable [risk of] disease and loss of his remaining kidney" and went undiagnosed until April 2006.  Langfitt Decl., Ex. 9, pp. 2-4, ¶¶ 7, 10, 16.  These allegations, which focus on the chronic and foreseeable progression of his renal disease, might well be interpreted to mean that Bielenberg would have had at least some of the same problems without the effects of Dr. Larson's negligence.  However, the second sentence of paragraph 31 was not amended to specify which of the "[e]ffects of kidney failure" were or were not attributable to negligence by Dr. Larson.

As described above, the pleadings in the Bielenberg Medical Malpractice Action are somewhat open to interpretation, but include an allegation in paragraph 31 that Bielenberg was seeking damages from Dr. Larson for – without limitation – "the effects of kidney failure, and the

subsequent treatments."  That broad allegation arguably includes not only the [REDACTED]

Bielenberg developed, but also the dialysis and kidney transplant he underwent.  Such an

allegation is inconsistent with an assertion that Dr. Larson's negligence, in fact, had nothing to

do with the need for dialysis and a kidney transplant.  In addition, as noted by defendants, a

settlement is considered a "success" in a prior proceeding.  *Rissetto v. Plumbers and Steamfitters*

*Local 343*, 94 F3d 597, 604-05 (9th Cir 1996).  In this case the settlement contained unrestricted

release language, encompassing "any and all known or unknown claims for bodily and personal

injuries . . . which has resulted or may result from the medical care and treatment rendered."

Langfitt Decl., Ex. 11, p. 1.  In her June 1, 2009 email to Woods and Daniels commenting on Dr.

Whitman's opinions, Laidler expresses some concern that "the complaint itself specifically states

that the insured was negligent and also states that the pain and suffering was attributable to the

renal failure, dialysis, and transplant."  Mayfield Decl., Ex. 7.  Laidler "wonder[ed] if

[Bielenberg] was reimbursed solely for his medical bills and we are being asked to let him walk

away."  *Id*.

      Nevertheless, this court is not inclined to apply judicial estoppel to prevent reaching the

merits of whether ODS abused its discretion in interpreting the Benefit Plan.  As described

above, as early as July 2008, ODS was aware that Bielenberg was willing to settle a lawsuit

claiming $2.5 million in damages for only $[REDACTED] because his treating doctors and

retained experts could not establish the critical causal link between his need for dialysis and a

kidney transplant and any negligence by Dr. Larson.  ODS expressed its willingness to consider

any additional information in that regard, but continued to assert that it had a valid lien, citing a

provision in the Benefit Plan that "the Plan is entitled to receive the amount of Benefits it has

paid whether the health care expenses are itemized or expressly excluded in the Third Party

recovery." Mayfield Decl., Ex. 13. ODS argues that unless judicial estoppel is applied, it is

disadvantaged by having to prove the malpractice case for Bielenberg against Dr. Larson.

However, Bielenberg is not trying to shift that burden to defendants. Instead, the issue is whether

ODS abused its discretion in interpreting the Benefit Plan in light of its conflict of interest and

the information it had available when it made its decision, the remaining issue to which this court

now turns.

### 2. **ODS's Flawed Interpretation**[19]

Defendants maintain that they are entitled to a constructive trust over the settlement

proceeds because the Benefit Plan paid benefits for treatment received by Bielenberg associated

with or related to an illness or injury caused or aggravated by Dr. Larson. The Benefit Plan paid

benefits for Bielenberg's dialysis and a kidney transplant but apparently not for treatment of

[REDACTED]. In defendants' view, dialysis and a kidney transplant are problems associated

with or related to Bielenberg's kidney disease.

This court concludes that defendants' interpretation of the Benefit Plan is flawed. The

language of the Benefit Plan premises its rights of recovery on a causal connection between the

amounts to be recovered and the cause or aggravation of an injury or illness for which benefits

were paid. Thus, the Benefit Plan may only impose a constructive trust for benefits paid to treat

the illness or injury which was caused or aggravated by Dr. Larson.

---

[19] The parties also discuss whether Bielenberg may assert a "make whole" defense in this action. However, this court concludes that ODS abused its discretion in interpreting the Benefit Plan, necessitating release of all but a fraction of its lien against Bielenberg's settlement proceeds. Given that conclusion, the court need not address the "make whole" defense at this time.

The Third-Party Liability provision begins by stating the Benefit Plan "may have a legal right to recover benefit or healthcare costs from another person . . . *as a result of an injury or illness for which benefits or healthcare costs were paid by the Plan*."  Laidler Decl., Ex. 1, p. 11 (emphasis added).  That statement is followed by two examples including recovery from "an individual or entity *responsible for the injury*" or, in an employment injury context, recovery from a workers' compensation insurer "responsible for healthcare expenses *connected with the illness or injury*."  *Id* (emphasis added).  Similarly, the Right of Recovery section restricts the amounts the Covered Individual must hold in trust for the Benefit Plan to "the amount of Benefits the Plan paid for *that* illness or injury."  *Id*, p. 12 (emphasis added).

The Right of Recovery provisions in the Third-Party Liability section of the Benefit Plan provide that the Covered Individual (Bielenberg) "holds any rights of recovery against the Third Party in trust for the Plan, but only for the amount of Benefits we[20] paid for *that illness or injury*."  Laidler Decl., Ex. 1, p. 12 (emphasis added).  The Benefit Plan does not define the phrase "that illness or injury," but other provisions in the Benefit Plan leave no doubt that it includes a causal component.  A "Third Party Claim" is defined as "any claim . . . against a Third Party . . . by or on behalf of a Covered Individual."  *Id*.  A "Third Party" is, in turn, defined as "any individual or entity *responsible for* the injury or illness, or the aggravation of an injury or illness, of the Covered Individual."  *Id* (emphasis added).  As reflected in ODS's earliest correspondence to Linkous, a core issue in interpreting the Benefit Plan's right to reimbursement was the effect of Dr. Larson's negligence on Bielenberg's prognosis.  Mayfield Decl., Ex. 13 ("[ODS] is willing to review any additional information, including expert testimony, that can

---

[20] The 2008 version substitutes the words "the Plan" for "we" in this sentence.  Laidler Decl., Ex. 2, p. 13.

support your comments that this outcome was predictable and unavoidable, and that Dr. Larson's errors had little impact on Mr. Bielenberg's prognosis."). ODS's later communications with its own medical consultants reflected this same inquiry.

With the exception of Bielenberg's development of [REDACTED], the record reveals no evidence which would permit the conclusion that Dr. Larson's actions or inactions were causally tied to the dialysis or kidney transplant surgery suffered as a result of Bielenberg's chronic renal disease. To the contrary, Dr. Whitman opined that the delay in diagnosis linked to Dr. Larson's negligence "had minimal, if any, effect on the course of this patient's disease," and ODS's medical consultant, Dr. Johnson, noted that Bielenberg "may have required dialysis and a transplant independent of [Dr. Larson's alleged negligence]." *Id*, Ex. 9. Dr. Freedman was "not so sure" that the record indicated medical malpractice at all, much less that Dr. Larson's negligence necessitated a kidney transplant. *Id*.

ODS seizes on various provisions of the Benefit Plan which state that its right to recovery "includes the full amount of the Benefits paid . . . out of any recovery made by the Covered Individual from the Third Party, including, without limitation, any and all amounts from the first dollars paid or payable to the Covered Individual . . . regardless of the characterization of the recovery [and] whether or not the Covered Individual is made whole." Laidler Decl., Ex. 1, p. 13; see also *id*, p. 11 (Benefit Plan beneficiaries are obligated to "reimburse the Plan in full from any recovery the Covered Individual may receive, no matter how the recovery is characterized"); and (2) "the Plan is entitled to receive the amount of Benefits it has paid whether the health care expenses are itemized or expressly excluded in the Third Party recovery." *Id*, p. 12.

However, the Right of Recovery provisions expressly state that Benefit Plan beneficiaries hold rights of recovery in trust "*only* for the amount of Benefits [the Plan] paid for that illness or injury." *Id* (emphasis added).  As described above, the only fair reading of the Benefit Plan's provisions is that "*that* illness or injury" is one for which the "Third Party" is "*responsible*" for causing or aggravating.  There is simply no parsing out the provisions cited by ODS from the nature of the Third Party Claim:  rights of recovery exist only against individuals or entities who cause or aggravate an illness or injury for which the Benefit Plan pays benefits.  Assuming that the benefits paid were for illnesses or injuries caused or aggravated by an individual or entity (Third Party) against whom a Covered Individual successfully receives a recovery, then – and "*only*" then – are those amounts held in trust for the Benefit Plan under the Right of Recovery section.

ODS attempts to skirt this causation requirement by citing one sentence that "it is entitled to be reimbursed for any benefits paid by the Plan that *are associated* with any illness or injury." *Id*, p. 11.  According to ODS, *all* of the benefits it paid are "associated" with Bielenberg's kidney disease.  However, again, the sentence cited by ODS continues on and incorporates the need for recovery from a "Third Party," which as described above, presumes responsibility for causing or aggravating the illness or injury:  "the Plan . . . is entitled to be reimbursed for any benefits paid by the Plan that are associated with any illness or injury *that are or may be recoverable from a Third Party or other source*." *Id* (emphasis added).

Dr. Larson did not cause Bielenberg's kidney disease, and the only evidence in the record is that Bielenberg's dialysis and kidney transplant were unavoidable and "independent" of Dr. Larson's alleged negligence.  Mayfield Decl., Exs. 8, 18.  Linkous acknowledged that there

was "some expert testimony that the [REDACTED] was anticipated, but was more severe than

expected" and admitted that "the increased severity was arguably due to the substantial period of

time Mr. Bielenberg went unmonitored by a nephrologist."  Daniels Decl., Ex. 2, p. 1.  This is

consistent with the characterization by the Practitioner Data Bank of the settlement as one

"failure to diagnose advancing chronic renal insufficiency leading to [REDACTED]."  Laidler

Decl., Ex. 6.

Accordingly, the Benefit Plan provides a right of recovery out of settlement funds from a

Third Party only where there is a causal connection between the benefits paid and the injury or

illness caused or aggravated by the Third Party.

## ORDER

For the reasons stated above, ODS's Motion for Partial Summary Judgment (docket #44),

Metro West's Motion for Partial Summary Judgment (docket #49), Plaintiff's Motion for

Summary Judgment (docket #61), and Counterclaim Defendant's Motion for Summary Judgment

(docket #71) are GRANTED IN PART AND DENIED IN PART, and Bielenberg's Motion for

Leave to File an Amended Complaint (docket #80) is DENIED.

As explained in this Opinion, this court concludes that the Benefit Plan is entitled to

reimbursement from the proceeds of the settlement in the Bielenberg Medical Malpractice

Lawsuit only insofar as the Benefit Plan paid benefits on behalf of Bielenberg that were causally

connected to an injury or illness caused or aggravated by the negligence of Dr. Larson.  Further

proceedings are required to determine the amount of reimbursement owed, if any.

This Opinion and Order is sealed.  On or before October 8, 2010, the parties shall submit

to the court a list of redactions to this Opinion and Order necessary to protect confidential

information.  On October 8, 2010, the court will unseal this Opinion and Order with appropriate

redactions, unless the parties show cause in writing before that date why the Opinion and Order

should remain sealed.

DATED this 27th day of September, 2010.

__/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge